IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

TRAVIS S. STEPP,                    )
                                    )
              Plaintiff,            )
                                    )
        v.                          )    Case No.
                                    )    05-3364-CV-S-REL-SSA
JO ANNE BARNHART, Commissioner )
of Social Security,                 )
                                    )
              Defendant.            )

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Travis Stepp seeks review of the final
decision of the Commissioner of Social Security denying
plaintiff's application for disability benefits under Titles
II and XVI of the Social Security Act ("the Act").
Plaintiff argues that (1) the ALJ erred in failing to give
controlling weight to plaintiff's treating physician, Dr.
Glynn, (2) the ALJ failed to properly derive a residual
functional capacity, (3) the ALJ failed to compare
plaintiff's determined residual functional capacity to his
past relevant work, and (4) the ALJ erred in failing to
conduct a proper credibility analysis. I find that the
substantial evidence in the record as a whole supports the
ALJ's finding that plaintiff is not disabled. Therefore,
plaintiff's motion for summary judgment will be denied and
the decision of the Commissioner will be affirmed.

## I.  BACKGROUND

On August 12, 2003, plaintiff applied for a period of disability and disability insurance benefits alleging that he had been disabled since February 7, 2002.  Plaintiff's disability stems from neck and back injuries and a mental impairment.  Plaintiff's application was denied on October 16, 2003.  On February 2, 2005, a hearing was held before an Administrative Law Judge.  On June 20, 2005, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On July 22, 2005, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is

2

supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

3

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

4

1. Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Michael Lala, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**EARNINGS RECORD**

The record establishes that plaintiff earned the following income from 1990 through 2002:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1990 | $    862.53 | 1997 | $ 3,393.70 |
| 1991 | 129.20 | 1998 | 1,245.60 |
| 1992 | 0.00 | 1999 | 11,238.13 |
| 1993 | 894.17 | 2000 | 3,181.77 |
| 1994 | 3,174.32 | 2001 | 10,366.98 |
| 1995 | 3,385.48 | 2002 | 1,266.13 |
| 1996 | 2,319.19 | | |

(Tr. at 61).

**Disability Report - Field Office**

On August 20, 2003, Don May of Disability Determinations had a face-to-face meeting with plaintiff (Tr. at 76-80). Mr. May observed that plaintiff had no difficulty with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using his hands, or writing (Tr. at 79).

**Claimant Questionnaire**

On August 29, 2003, plaintiff completed a Claimant Questionnaire (Tr. at 107-110). He described his symptoms

6

as follows:  "pain in neck, pain in back, swelling in neck and back, spasms in 3 areas from neck to lower back, shaking, numbness and tingling in all areas of body, locking up of neck and back, high blood pressure, and hip and leg going out.  Body thermostat messed up."  Plaintiff reported that he feels like this "all the time, since I broke my neck and spine injury."  His symptoms are "daily to hourly".  When asked to list the medications he was taking for his symptoms, he wrote, "none".

Plaintiff reported that he is able to cook a meal for himself or his family, shop, and do moderate cleaning and household chores necessary to keep up with his family.  He reported that he like to draw but cannot anymore due to neck discomfort.  He can drive but not for long distances.  He drives to take his son to and from school and to go to the grocery store.

Plaintiff was asked to describe any difficulties he has in using a phone:  "Holding it is impossible for any length of time.  What could go wrong...does."  He was asked who he takes care of.  He wrote, "Take care of my son, some household duties.  Come to think of it....not too much."

Case 6:05-cv-03364-REL   Document 11   Filed 01/10/07   Page 7 of 58

B.  *SUMMARY OF MEDICAL RECORDS*

February 7, 2002, is plaintiff's alleged onset date.
However, the first medical record in the file is a
consulting physician's report dated September 15, 2003.  On
that date, plaintiff was seen by Esther Wadley, D.O., at the
request of Disability Determinations (Tr. at 132-134).
Portions of Dr. Wadley's report read as follows:

> History of Present Illness:
> . . .  The patient originally applied in 1997, and was
> turned down, and tried to work in phone sales etc.
> However the patient felt he could not work and so is
> reapplying for disability. . . .  In 1988, the patient
> fell one story in an unfinished two-story house.  There
> was no staircase up to the upstairs and the patient
> fell from the upper level in the home to the lower
> level where they were living.  The patient at that time
> had injured his neck with the fall and had a subsequent
> fusion; he believes a level 5/6 in his neck with pins
> and bone rift.  The patient's right hand will loose
> [sic] feeling if he sits for more than twenty minutes.
> He'll get a burning sensation in his arm that also goes
> to the entire back of his neck and upper shoulder area.
> The patient also gets headaches.  The patient says that
> he had his spine damaged in three areas and his back
> can "go out" at anytime.  It will lock up and he can't
> move.  If the patient bends to lift then his back locks
> up.  Patient says that if he writes for more than three
> minutes his hand will go numb, and he cannot hold
> things.
>
> * * * * *
>
> Current Medications:
> None.
>
> * * * * *

8

Social History:
The patient smokes a pack and a half of cigarettes a day for fifteen years, drinks alcohol occasionally, denies illegal drug use, he has a tenth grade education with no GED, the patient has worked occupations as a laborer and telephone sales.

                    * * * * *

Physical Examination:
Vital signs:  Blood pressure 142/72. . . .  Patient's muscle strength was 5/5 upper and lower extremities bilaterally with very poor effort.  Gate was normal with no foot drop, with no assistance devices.  Patient could heel walk and toe walk.  Patient's spine to examination, he had slightly anterior rotated hip on the right and a slight left side thoracic scolioses[1] at approximately 3 degrees and a left side back compensated lumbar scolioses of less than 3 degrees, however patient's range of motion on his spine is normal.  Patient's cervical spine is slightly decreased range of motion, as was being consistent with cervical spinal fusion surgery.  Psychiatric effect was appropriate. . . .

Impression:
Neck and back injury with no observed functional limitations on activities of daily living.  Patient might be limited in lifting less than 25 pounds on a frequent basis.

    Plaintiff's range of motion charts were included with

Dr. Wadley's report (Tr. at 136-137).  His range of motion

for both shoulders, elbows, wrists, knees, hips, and lumbar

spine were all normal.  His range of motion in his cervical

spine was slightly reduced.  Lateral flexion (bending the

head side to side) was 25° (normal is 45).  Flexion (bending

_____

    [1]Lateral curvature of the spine.

                    9

the down) was 50° (normal is 60). Extension (bending the head back) was 65° (normal is 75). Rotation (turning the head side to side) was 60° on the right and left (normal is 80).

On November 18, 2003, plaintiff saw Paul Glynn, D.O. (Tr. at 149). He reported that he was punched in the face and got three teeth knocked out. Most of this very short record is illegible. Dr. Glynn assessed dental abscess.

On November 20, 2003, plaintiff saw Dr. Glynn for a recheck on his teeth (Tr. at 149). He reported that the Lidocaine [a topical medication for pain] helped some, but he was still unable to sleep due to pain. The rest of this very short record is illegible.

On December 2, 2003, plaintiff saw Dr. Glynn, reporting that fragments of his teeth were coming through his gums (Tr. at 148). He said the antibiotics upset his stomach. "Decreased swelling. Working on attorney about having more pain with fragments coming out. [illegible] versus Lidocaine. Using [illegible]. Taking [illegible] twice a day." The remainder of this record is illegible.

On December 16, 2003, plaintiff saw Dr. Glynn to "check meds and paperwork" (Tr. at 147-148). "When he was 16 years old, fell one story. Suffered fractures at C5, C6,

10

developed chronic strain [illegible].  Has numbness to a
[illegible] in hands.  Hands fatigue easily.  Writing
fatigues hand rapidly and handwriting quality decreased.
Has a chronic pain problem ears.  Says pain causes memory
and concentration problems.  When he is on his feet a large
part of the day he must recline and rest.  Neck pain
increases throughout the day.  Frequent HA [headache].  If
he lifts he frequently gets a tremor that lasts for hours.
When he fell he was unconscious for hours.  Had a
significant memory loss for at least one week afterward.
Will put on [illegible].  Says he awakens once during the
night now due to pain.  Note:  Had a left pneumothorax
[collapsed lung] and [illegible] during surgery to stabilize
neck.  Could have suffered anoxic [illegible] either from
fall or arrest during surgery.  10th grade education."  Dr.
Glynn assessed cervical degenerative joint disease, thoracic
degenerative joint disease, and closed head injury.

Later that same day, Dr. Glynn wrote a letter to
plaintiff's disability attorney (Tr. at 139).  The letter
reads as follows:

> In regard to Mr. Stepp, I have completed the medical
> source statements he brought in.  I reviewed his
> history with him and I wish to emphasize several
> points.

When he fell one story and received his neck injury, he
apparently was totally unconscious for several hours.
This can indicate a serious concussion. In addition,
he states that during the surgery to stabilize his
neck, he suffered a pneumothorax [collapsed lung] and
cardiac arrest. Even though I am sure his
resuscitation was immediate, there is a definite chance
that he suffered an anoxic brain injury from
interrupted circulation. He states that his
disabilities listed in the source statement began at
that time. He remembers not having any problems with
memory or organization prior to that. Indeed, he
dropped out of school in the 10th grade, subsequent to
the accident due to his inability to function at
school.

As indicated in the source statement, he does have some
physical and mental limitations, and the combination of
those, I feel, rises to the level of disability.

That same day, Dr. Glynn completed a Medical Source
Statement Physical (Tr. at 140-141). He found that
plaintiff could frequently lift and carry less than five
pounds, occasionally lift and carry up to ten pounds, could
stand or walk for 15 minutes continuously and for a total of
four hours each day, could sit continuously for 15 minutes
and for a total of two hours each day, and was limited to
pushing and pulling ten pounds occasionally and less than
five pounds frequently. He found that plaintiff could
frequently balance; could occasionally climb, stoop, kneel,
crouch, crawl, reach, handle, finger, or feel; and could
never see, speak, or hear.

12

Dr. Glynn found that plaintiff should avoid any exposure to extreme cold due to back pain; should avoid any exposure to vibration; should avoid moderate exposure to weather, wetness, and humidity; and should avoid concentrated exposure to extreme heat, dust, fumes, hazards, and heights.

He found that plaintiff needs to lie down or recline for 30 minutes every two hours due to pain. He concluded with the following: "Pain limits activities and reaches levels where concentration is affected."

Dr. Glynn also completed a Medical Source Statement Mental (Tr. at 142-143). He made the following findings:

He found that plaintiff was not significantly limited in the following:

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

13

He found that plaintiff was moderately limited in the
following:

- The ability to understand and remember very short and
  simple instructions

- The ability to carry out very short and simple
  instructions

- The ability to make simple work-related decisions

- The ability to interact appropriately with the general
  public

He found that plaintiff was markedly limited in the
following:

- The ability to remember locations and work-like
  procedures

- The ability to respond appropriately to changes in the
  work setting

- The ability to set realistic goals or make plans
  independently of others

He found that plaintiff was extremely limited in the
following:

- The ability to understand and remember detailed
  instructions

- The ability to carry out detailed instructions

- The ability to perform activities within a schedule,
  maintain regular attendance, and be punctual within
  customary tolerances

- The ability to sustain an ordinary routine without
  special supervision

14

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to travel in unfamiliar places or use public transportation

Finally, he made no finding at all with regard to plaintiff's ability to maintain attention and concentration for extended periods.

On December 17, 2003, plaintiff saw Dr. Glynn and complained of a headache and that his ears were hurting (Tr. at 146). "Gave him a frontal headache. Also says it wasn't effective at controlling pain. Also requests anxiety [illegible]. Says pain med made [illegible]. Will switch to Lorcet Plus[2] and add some Oxazepam[3]." Dr. Glynn assess cervical degenerative joint disease, thoracic degenerative joint disease, and anxiety.

On January 16, 2004, plaintiff saw Dr. Glynn for a follow up (Tr. at 146). "Pain med seems to be working well. Oxazepam is too short acting. Didn't receive any relief

_____

[2]Acetaminophine (Tylenol) and hydrocodone (a narcotic analgesic, the effect of which is increased with the addition of acetaminophine).

[3]A benzodiazepine used to treat anxiety.

15

from anxieties.  Will switch to Alprazolam[4].

On February 5, 2004, plaintiff saw Paul Glynn, D.O., complaining that his "nerve meds" were not working (Tr. at 145).  "Anxieties are worse, says he is near a nervous breakdown.  Having problems with energy, relationships, describes mood swings, rapid [illegible], depression. Will start Risperdal[5].  Discussed ADD [attention deficit disorder] factors, very distractable, forgetful, procrastinates, impulsive, did poorly in school, didn't finish.  Has had trouble holding a job, trouble with relationships.  Discussed medications.  Will start with Wellbutrin [antidepressant].  Discussed [illegible] as well."  Dr. Glynn assessed attention deficit disorder, depression, bipolar disorder, and closed head injury.

On February 19, 2004, plaintiff saw Dr. Glynn for a follow up (Tr. at 156).  "Wellbutrin is helping.  Will start [illegible].  Says he would like to increase Alprazolam. Long discussion."  Dr. Glynn assessed attention deficit disorder, cervical degenerative joint disease, and thoracic degenerative joint disease.

---

[4]A benzodiazepine used to treat anxiety.

[5]Risperdal is an antipsychotic medication used to treat schizophrenia and bipolar disorder.

On March 19, 2004, plaintiff returned to see Dr. Glynn for a follow up (Tr. at 156). "Says [illegible] helps more than Wellbutrin but seems more anxious. Says he can tell he is more focused. Has asked for increase in Alprazolam. I will increase to q.i.d. [four times a day]. Have discussed." The last sentence of the record is illegible. Dr. Glynn assessed attention deficit disorder, cervical degenerative joint disease, thoracic degenerative joint disease, and anxiety.

On April 1, 2004, plaintiff saw Dr. Glynn for a recheck (Tr. at 155). Plaintiff complained of stress and anxiety. "[illegible] raised his BP [blood pressure], felt very bad, had lesions on tongue. Will go back to [illegible]. Says he feels [illegible] in spite of alpraz[olam]. Says he feels depressed, can't get relaxed. Takes 1.0 mg Risperdal at hs [bedtime]. Will add Zoloft and refill [illegible]." Dr. Glynn assessed attention deficit disorder, depression, cervical degenerative joint disease, and thoracic degenerative joint disease.

On April 30, 2004, plaintiff saw Dr. Glynn for a check up (Tr. at 154). He said Lorcet [hydrocodone, a narcotic analgesic] was making him feel "goofy" at times. "Will switch to Percocet [oxycodone, a narcotic analgesic]. Says

17

Risperdal 1.0 frequently causes a 'hangover' in the morning. Will cut back to 0.5. Zoloft[6] helping a lot." Dr. Glynn assessed attention deficit disorder, bipolar disorder, closed head injury, and cervical degenerative joint disease.

On May 28, 2004, plaintiff saw Dr. Glynn for a recheck (Tr. at 154). "Discussed prior problems. His significant other is dispensing his meds. Will refill current meds. His significant other will pick them up. He has post traumatic stress disorder from very violent childhood." Dr. Glynn assessed attention deficit disorder, post traumatic stress disorder, closed head injury, and cervical degenerative joint disease.

On June 28, 2004, plaintiff saw Dr. Glynn for a check up (Tr. at 153). "Doing well, Risperdal has helped a lot". Dr. Glynn assessed attention deficit disorder, post traumatic stress disorder, closed head injury, and cervical degenerative joint disease.

On July 28, 2004, plaintiff saw Dr. Glynn for a check up on anxiety, neck pain, and back pain (Tr. at 153). Dr. Glynn assessed post traumatic stress disorder, closed head

---

[6]Zoloft is a selective serotonin reuptake inhibitor used to treat anxiety, depression, obsessive-compulsive disorder, and post traumatic stress disorder.

Case 6:05-cv-03364-REL   Document 11   Filed 01/10/07   Page 18 of 58

injury, and cervical degenerative joint disease.

On August 27, 2004, plaintiff saw Dr. Glynn for a recheck on anxiety (Tr. at 152). Plaintiff said he wanted to increase his Risperdal.

On September 24, 2004, plaintiff saw Dr. Glynn (Tr. at 152). He was back home, back together with his significant other. "She is to manage his meds".

On September 27, 2004, plaintiff saw Dr. Glynn (Tr. at 152). "Beat up by stepson. Kicked out of home. Now living with Gerald Schroeder in Rogersville. Med 1/2 stolen and had 2 weeks worth, told him to get things in order and call us in two weeks."

On October 27, 2004, plaintiff saw Dr. Glynn for back pain (Tr. at 151). "[illegible] with significant other. Discussed situation with both. Will continue to treat but zero tolerance. Discussed chronic problems. He must stay on Risperdal and [illegible] and go to counseling when available." Dr. Glynn assessed post traumatic stress disorder, closed head injury, and cervical degenerative joint disease.

On November 24, 2004, Dr. Glynn completed a second Medical Source Statement Physical (Tr. at 158-159). He found that plaintiff could frequently lift or carry less

19

than five pounds, occasionally lift or carry 15 pounds,
stand or walk for 15 minutes at a time and for three hours
per day, sit for 30 minutes at a time and for three hours
per day, and was limited in his ability to push or pull to
the same extent as his lifting restriction.  He found that
plaintiff could frequently reach; could occasionally
balance, stoop, kneel, crawl, handle, or feel; and could
never climb, crouch, finger, see, speak, or hear.  He found
that plaintiff should avoid any exposure to extreme cold,
extreme heat, wetness, humidity, and vibration; he should
avoid moderate exposure to weather, hazards, and heights;
and he should avoid concentrated exposure to dust and fumes.
He found that plaintiff needs to lie down or recline for one
hour twice a day.  He was asked whether plaintiff's pain,
use of medication, or side effects cause a decrease in
concentration, persistence, or pace, and he checked "yes".
When asked to describe, Dr. Glynn left that section blank.

    That same day, Dr. Glynn completed a second Medical
Source Statement Mental (Tr. at 161-162).  Dr. Glynn found
that plaintiff is not significantly limited in the
following:

- The ability to understand and remember very short and
  simple instructions

20

- The ability to carry out very short and simple instructions

- The ability to make simple work-related decisions

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

Dr. Glynn found that plaintiff was moderately limited in the following:

- The ability to remember locations and work-like procedures

- The ability to sustain an ordinary routine without special supervision

- The ability to set realistic goals or make plans independently of others

He found that plaintiff was markedly limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to work in coordination with or proximity to others without being distracted by them

21

- The ability to ask simple questions or request assistance

- The ability to respond appropriately to changes in the work setting

- The ability to travel in unfamiliar places or use public transportation

Finally, Dr. Glynn found that plaintiff was extremely limited in the following:

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

On February 21, 2005, plaintiff saw David Lutz, Ph.D., a clinical psychologist, at the request of Disability Determinations (Tr. at 163-177). Portions of Dr. Lutz's report read as follows:

> REFERRAL
> Travis Stepp was referred by Lee Baker from Disability Determinations for an organicity evaluation to include history, the Wechsler Adult Intelligence Scale-III, the Wechsler Memory Scale-III, and Trails A and B. In addition, reports from P. D. Glynn, D.O. (dated December 2, 2003, through November 24, 2004) were reviewed.

22

PRESENTING PROBLEM

Mr. Stepp, whose stated age was 31, reported that he suffers from anxiety. He stated that he sometimes gets shaky and feels as if he is going to have a heart attack. He said that his heart races, which he related to stress. He explained that he might have such feelings when he talks about stressful situations such as altercations with others or problems with the police. He said that he sometimes becomes stressed with "creepy movies" such as those involving death. . . . He reported that he had anxiety in the past, but felt that his anxiety has increased in the past three years. He said that he experienced a breakdown within the past year which he attributed to being stressed. . . .

Mr. Stepp reported that he sometimes has difficulty controlling his temper. He said that he has a tendency to argue and speak his mind. He stated that when he snaps, he yells although this has occasionally degenerated into a fist fight. "Stress brings most of that on."

Mr. Stepp reported that he is generally content and is usually happy. He said that he is occasionally sad, but generally is happy. . . .

When asked about hallucinations, Mr. Stepp stated that his girlfriend has sometimes found him talking to someone while at the table. He was not sure that this actually occurs, but felt that stress elicits such experiences.

I asked Mr. Stepp about the statement in the reviewed report indicating that he had an altercation with his stepson a few months ago. He said that he became mouthy with his stepson and then "everything went black." He stated that he hit his girlfriend, who was trying to break them up, and he was jailed for assault. He said that when he thought about this incident, he was angry about it, which did not help the situation.

I asked Mr. Stepp about the statement that he came from a violent childhood. He stated that his parents did not abuse him. He said that he grew up in the projects for several years, and was involved in racial situations. He denied any recurrent, intrusive memories or hypervigilance.

I asked Mr. Stepp about the statements in the reviewed report that he may have suffered a closed head

23

injury.  He described various childhood injuries, such as an incident at age two, but did not describe any incidents as an adult.  He thought that he might have received stitches for some of these incidents, but did not require any other medical attention.

Mr. Stepp reported that he has problems with his memory.  He said that he has difficulty remembering details and instructions.  He said that he often does not remember the names of others or where he has met people.  He believed that his memory is about the same as it has always been.

HISTORY

Mr. Stepp reported that he attended school through the tenth grade at which time he quit school after having a neck injury.  He said that students tended to challenge him because he had a neck brace, and he did not want to fight them.  He described himself as a poor student, receiving primarily Fs while attending regular classes.  He said that he skipped school frequently, and instead would spend time by himself.  He said that he was suspended from school several times from grades six to ten primarily for fighting, sometimes with teachers.  He said that he had not obtained his GED. He said that he tried to study and attempt the exam once, but decided against this.

I asked Mr. Stepp about any attention-deficit/hyperactivity disorder characteristics.  He stated that when he would become bored in school, he would leave school.  He did not report any hyperactivity, such as getting out of his seat, and said that he was generally quiet in school.

Mr. Stepp reported that he rarely drinks by which he meant that he drank two beers two days prior to the interview and a six pack of beer about two weeks prior to the interview.  He indicated that he drinks at most a six pack of beer, which he might do every few months. He said that he drank whiskey from ages 12 to 18, and received a DUI about 11 years ago.  He felt that the breathalyzer was faulty, as the police officer had him blow twice.  He said that he has reduced his alcohol usage over the last 11 years.  He said that he experienced blackouts and withdrawal symptoms.

Mr. Stepp reported that he uses marijuana occasionally by which he meant about three times

24

yearly.  He indicated that he used this substance more frequently until about five years ago.  He said that he reduced his usage because it increases his anxiety.  He indicated that he experimented with cocaine and crank about five to six years ago, but denied any current usage.  He denied any other illicit drug usage.  When asked about prescription drug abuse, he suggested that he may have overused Xanax.  He explained that he forgot whether he had taken Xanax during the day, and he sometimes would take more than he should.  He said that this prompted his girlfriend to regulate his usage.  He denied any use of inhalants.  When asked about problems with the law, he stated that he was arrested for possession of paraphernalia about five months ago.  He stated that he has also been arrested for third degree assault and violating an ex parte order.  He said the he was incarcerated for 20 hours for the assault charge.

Mr. Stepp denied having been hospitalized in a psychiatric hospital, having participated in a substance abuse treatment program, or having received any psychological counseling.  He denied having attempted suicide.

FAMILY HISTORY

Mr. Stepp reported that he lives with his girlfriend of 14 years.  He denied having been married and has one child, age nine, who lives with him. . . .

PHYSICAL COMPLAINTS

Mr. Stepp brought the following medications with him:  Endocet, Alprazolam, Pemoline, Piroxicam, and Risperdal.  He said that he has taken similar medications for about a year.  He suggested that he does not take the medications as prescribed.  He takes Piroxicam daily, but takes Risperdal as needed.  He stated that when he gets aggravated, he may take 3 mg, possibly once or twice weekly.  He has not had the other medications for at least two weeks and probably closer to four weeks.  He said that medication has been helpful in reducing arthritic pain, and also helps him control his aggression. . . .

25

EMPLOYMENT HISTORY

Mr. Stepp reported that he worked in shipping. He said that he frequently had to change jobs, sometimes because of back problems and other times because he had difficulties with coworkers. He indicated that his longest job was in maintenance at a hotel for about a year. He said that he was last employed about two years [ago] at a paintball factory for two weeks at which time he was terminated because of poor work performance.

DAILY ACTIVITIES

Mr. Stepp reported that he typically gets up about 6:00 to 7:00 a.m., takes his arthritis medication, and does some light household work, such as washing dishes. He said that he and his girlfriend take turns with household duties as he tries to limit his exertion to minimize physical problems. He said that he might drink a liter of caffeinated beverages daily, although he was drinking more until a few months ago. He indicated that his girlfriend generally shops for the family, but he might prepare a meal occasionally. . . . He stated that in the afternoon and evening, he may help his son with homework. He may watch his son play outside or watches television. He said that he occasionally reads although he typically has had difficulty staying focused with reading. He stated that when he reads, he often does not remember what he has read. He said that he goes to bed about 9:30 to 10:00 p.m., but it might take him three hours to get to sleep which he attributed to anxiety. . . .

MENTAL STATUS

. . . He was responsive and cooperative but generally quiet. He did not seem to have much energy, and his eyes were bloodshot. He exhibited possible adequate motivation but little ambition to change things in his life. . . . He was pleasant. . . . He seemed able to understand and respond to normal conversation. His thoughts were logical and consistent. He did not evidence any significant distressed affect, or unusual or bizarre behavior. . . . He reported that his behavior during the interview was atypical of his behavior in general as he was more anxious here than in other places.

26

Mr. Stepp denied having had delusions, ideas of reference, compulsions, or obsessions.

TESTS ADMINISTERED
Wechsler Adult intelligence Scale-III (WAIS-III)
Wechsler Memory Scale-III (WMS-III)
Trails A and B

* * * * *

DIAGNOSIS
Based on the client's subjective report of some anxiety and observations of limited energy during this examination, the most appropriate diagnoses are likely to be:

Axis I:    Generalized anxiety disorder
           This assumes that alcohol and drug usage do
           not account for his behavior.

           Rule out alcohol and/or cannabis abuse
           He reported abusive behavior in the past of
           alcohol, marijuana, and possibly
           benzodiazepines.  He reported reduced usage,
           but also indicated that he was arrested on
           paraphernalia charge within the past five
           months.  If he is using alcohol and/or
           marijuana more than he suggested, it could
           certainly explain his behavior and
           appearance.

Axis II:   Antisocial characteristics
           He may meet the criteria for a personality
           disorder.

                    * * * * *

Axis IV:   Limited education, unemployment, legal
           problems

Axis V:    GAF = 60 (Current)
           Mild to moderate symptoms

27

```
MEDICAL SOURCE STATEMENT
     Mr. Stepp seemed able to understand and remember
simple and moderately complex instructions but would
have difficulty with some complex instructions.  He
seemed able to sustain concentration and persistence on
simple and moderately complex tasks but would have
difficulty with complex tasks.  He seemed able to
interact in moderately demanding social situations.  He
seemed able to adapt to his environment.
```

On April 6, 2005, Administrative Law Judge L. W. Henry wrote

a letter to Dr. Paul Glynn requesting additional information

(Tr. at 178-180).  The ALJ quoted the limitations set forth

by Dr. Glynn in his medical source statements, and then

wrote, "Please advise as to the basis for these limitations,

particularly whether it is based on the claimant's

allegations to you, or upon medical evidence.  If the

latter, could you further advise as to any anatomical or

physiological abnormalities which would support your

conclusions?  If you did range of motion studies, or relied

on outside expertise, such as referral to specialists, I'd

request that you advise us."

     With respect to the mental limitations found by Dr.

Glynn, the ALJ wrote, "I would ask that you advise us to how

you reached your conclusions as to the claimant's mental

limitations.  Did you perform psychological testing or send

the claimant to mental health professionals?  In view of the

claimant's history of drug abuse, did you conclude this was

28

in remission or did you subtract the further impact of such usage? Again, if the MSS-M was completed based on the claimant's answers, I need to know this as well." The ALJ indicated the amount the doctor could be paid for providing this information, sent a franked envelope with his request, and told the doctor the record would remain open for two weeks awaiting the doctor's response.

There is no response in the record from Dr. Glynn.

### C. *SUMMARY OF TESTIMONY*

During the February 2, 2005, hearing, plaintiff testified; and Michael Lala, a vocational expert, testified at the request of the ALJ.

### 1. Plaintiff's testimony.

Plaintiff had a friend drive him to the administrative hearing, which took 30 to 40 minutes (Tr. at 195). He does not have a driver's license: "When I had it, I didn't drive much. I never pursued to get it back." (Tr. at 195). His license was suspended two years earlier for DWI (Tr. at 196).

At the time of the hearing, plaintiff was 31 years of age and is currently 33 (Tr. at 196). He is 5'11" tall and weighs 145 pounds (Tr. at 196). He completed 9th grade and dropped out in 10th grade (Tr. at 196-197). Plaintiff never

29

got a GED (Tr. at 197).

Plaintiff fell and broke his neck and three vertebrae in his back (Tr. at 198).  They had to do surgery to put wires in his neck (Tr. at 198).  Plaintiff said he died on the operating table during surgery, and Dr. Glynn told him that he will therefore always suffer from depression (Tr. at 197-198).  Dr. Glynn called it "pump head syndrome", which is from lack of blood in the brain for a period of time (Tr. at 197-198).  Plaintiff explained that the anesthesia killed him; it collapsed his left lunch and he went "flat-line" while they were working on his neck (Tr. at 198).

The ALJ asked plaintiff's attorney why none of those medical records were in the file, and the attorney stated that she was not sure (Tr. at 198).

In November 2003, plaintiff was at a friend's house and some guy "went belligerent and started beating on the guy that lives there".  He grabbed the man's wife and was "in full swing".  Plaintiff knocked the woman out of the way and caught the punch which knocked three of his teeth out (Tr. at 199).  He testified that he did not punch the man (Tr. at 199).

In September 2004, plaintiff got "mouthy" with his step son (Tr. at 199).  Plaintiff was sitting at the kitchen

30

table, and the step son got up and hit plaintiff twice in the face and on each side of his ribs and knocked him to the floor (Tr. at 199). "I got myself off the floor. I called the cops, and I went to jail." (Tr. at 199). Plaintiff testified he never touched his step son (Tr. at 199).

The ALJ asked plaintiff about Dr. Glynn's record in July 2004 stating that plaintiff's significant other would disperse his medications, and in October 2004 where he said, "will continue to treat, but zero tolerance." Plaintiff testified that some police officers poured his medication out and put the medicine in their pockets (Tr. at 200). When he told Dr. Glynn this, he made the comment about zero tolerance (Tr. at 200).

Plaintiff is seeing no doctor other than Dr. Glynn (Tr. at 200). Plaintiff's Percocet and Xanax make him feel druggy (Tr. at 200).

The ALJ noted that plaintiff earned $129 in 1991 (the year plaintiff turned 18) and earned no money in 1992 (Tr. at 201). He asked plaintiff what he was doing those years, and plaintiff said he was having problems with his back and neck so he did not work (Tr. at 201).

Plaintiff testified that his pain radiates into his arms and legs (Tr. at 206). If he over exerts himself, he

31

gets partial paralysis in his left leg (Tr. at 206). His hands get numb (Tr. at 206). His fingertips and toes are always numb, and he shakes excessively throughout the day (Tr. at 206-207). If there are storms in the area, plaintiff's neck will swell up and his back goes out (Tr. at 207). When it is cold, his neck locks up and hurts (Tr. at 207). Plaintiff's lower back is always knotted up (Tr. at 207).

Plaintiff testified that he can sit for about 15 minutes at a time (Tr. at 207). He has problems walking long distances because of his lower back (Tr. at 207). He can walk a couple of blocks, then his knees get shaky and weak (Tr. at 208). Plaintiff has problems with balance, but he has always caught himself and has not fallen down (Tr. at 208).

Plaintiff can lift something a little under ten pounds (Tr. at 208). He cannot bend over because his back locks up; he has to squat (Tr. at 208). When plaintiff's back locks up, he has to put pillows under his legs, sit upright, and take his medication (Tr. at 208). It usually lasts a week before it unlocks (Tr. at 208). This happens all the time (Tr. at 208).

32

Plaintiff can climb stairs but it makes his back and neck hurt (Tr. at 209). Reaching causes his neck to hurt (Tr. at 209). His numb and shaky hands cause him to drop things occasionally, and he has trouble writing (Tr. at 209). Looking up does not bother him, but looking down sometimes bothers his neck (Tr. at 209). His neck and back will hurt if he pushes and pulls (Tr. at 209-210).

The ALJ asked, "Did you have a head injury when you injured your back and neck?" (Tr. at 210). Plaintiff responded, "Not that I'm aware of, no." (Tr. at 210). He testified that he just started developing problems with attention deficit disorder and anxiety over the last couple of years (Tr. at 210). Plaintiff's heart beats fast all the time. It is hard for him to concentrate when he is depressed. He loses his temper easily. He avoids people because "I'm just kind of worried with my back and neck being messed up, and I don't want to be hit" (Tr. at 210-211). Plaintiff has had panic attacks, he gets dizzy, he has racing thoughts all the time, he has problems sleeping (Tr. at 211). He gets headaches and cannot concentrate, and this happens all the time (Tr. at 211). He gets headaches two to three times per week for several hours (Tr. at 212).

33

Plaintiff needs to lie down either for several hours at a time or for an hour here, an hour there (Tr. at 212). This is to relieve the pressure on his neck and back (Tr. at 212). He only needs help with personal hygiene if his back goes out, then he needs help getting to the bathroom (Tr. at 212). He does light housework, washes the dishes, vacuums (Tr. at 213).

Plaintiff lives with his significant other and his nine-year-old son (Tr. at 214). Sometimes he goes outside to watch his son play (Tr. at 214).

**2.    Vocational expert testimony.**

Vocational expert Michael Lala testified at the request of the Administrative Law Judge. He testified that plaintiff's past work as a telephone solicitor had an SVP[7] of three (Tr. at 218).

The ALJ asked the vocational expert to consider the medical source statement mental completed by Dr. Glynn in 2004 (Tr. at 219-220). The vocational expert testified that

---

[7]Selected Vocational Preparation. The SVP indicates the normal amount of time required to learn the techniques, acquire information, and develop the facility necessary for average performance in a specific job-worker situation. Training time can be acquired in a school, work, institutional, or vocational environment. An SVP of 3 means it takes over 30 days and up to three months to learn the job.

34

a person with the mental residual functional capacity set out by Dr. Glynn would not be able to work full time (Tr. at 220). This is mainly because the ability to perform activities within a schedule is precluded and the ability to complete a normal workday is precluded (Tr. at 220).

The ALJ then asked the vocational expert to consider the medical source statement physical completed by Dr. Glynn in 2004, except that the ALJ excluded the limitations on seeing, speaking, and hearing that Dr. Glynn had imposed (Tr. at 220-221). The vocational expert testified that such a person could do no work because of the need to lie down twice a day for an hour at a time, and the ability to work only six hours per day (Tr. at 221).

The final hypothetical involved a person who could lift under ten pounds occasionally, walk a couple of blocks at a time, sit for 15 to 30 minutes, do no bending, occasionally crouch or stoop, do no reaching, occasionally grip or grasp, do no pushing or pulling, and would need to lie down for a couple of hours during the day (Tr. at 222-223). The vocational expert testified that such a person would not be able to perform full-time work (Tr. at 223).

35

## V.    FINDINGS OF THE ALJ

On June 20, 2005, ALJ L. W. Henry entered his opinion (Tr. at 17-25).

At step one of the sequential analysis, the ALJ found that plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 18).  He did work for a brief time as a packer for Outland Sports Paintball, but he was let go for poor job performance (Tr. at 18).  The ALJ found that this job was an unsuccessful work attempt (Tr. at 18).

At step two, the ALJ found that plaintiff suffers from the severe impairments of neck and back injury and generalized anxiety disorder (Tr. at 18).

At step three, the ALJ found that plaintiff's impairments do not meet or equal a listed impairment (Tr. at l18).

Plaintiff's past relevant work includes positions as a telephone solicitor, janitor, product assembler, painter, and industrial maintenance worker (Tr. at 18).  After reviewing the evidence in the record, the ALJ found that plaintiff retains the physical residual functional capacity to lift and/or carry and push or pull up to ten pounds frequently and 20 pounds occasionally; sit for at least six

36

hours in an eight-hour workday with usual breaks; stand
and/or walk for at least six hours in an eight-hour workday
with usual breaks; and he has no postural, manipulative,
visual, communicative or environmental limitations (Tr. at
22). He found that plaintiff retains the mental residual
functional capacity to understand, remember, and carry out
simple instructions; use judgment in making simple work
related decisions; respond appropriately to supervision,
coworkers, and usual work situations; deal with changes in a
routine work setting; maintain persistence and pace on
simple tasks; and get to work regularly and remain at the
workplace for a full day (Tr. at 22-23).

Given this residual functional capacity, plaintiff can
perform competitive remunerative work at the light
exertional level (Tr. at 23). His past relevant work of
product assembler is unskilled light work, both as performed
in the national economy and as performed by plaintiff, based
on vocational expert testimony (Tr. at 23). The ALJ found
that plaintiff retains the mental and physical residual
functional capacity to perform his past relevant work as a
product assembler (Tr. at 23).

Therefore, plaintiff was found not disabled at the
fourth step of the sequential analysis.

## VI.  CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A.  CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be

38

evaluated solely on the basis of objective medical evidence
or personal observations by the ALJ.  In determining
credibility, consideration must be given to all relevant
factors, including plaintiff's prior work record and
observations by third parties and treating and examining
physicians relating to such matters as plaintiff's daily
activities; the duration, frequency, and intensity of the
symptoms; precipitating and aggravating factors; dosage,
effectiveness, and side effects of medication; and
functional restrictions.   Polaski v. Heckler, 739 F.2d
1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p
encompasses the same factors as those enumerated in the
Polaski opinion.

The specific reasons listed by the ALJ for discrediting
plaintiff's subjective complaints of disability are as
follows:

> [T]he undersigned finds that the evidence overall does
> not support the claimant's allegations of a disabling
> degree of subjective complaints and functional
> limitations.
>
> The medical evidence includes treatment records and
> medical source opinions from the claimant's general
> treating physician, Paul Glynn, [D.O.], dating back to
> November 18, 2003.  There are no medical records dating
> from the alleged onset date of disability of February
> 7, 2002, through November 2003.  The claimant first saw
> Dr. Glynn due to having 3 teeth knocked out in an
> altercation.  He was given pain medications for dental

39

abscess.  The claimant was seen on December 16, 2003 for "check of medications and paperwork".  The claimant related to Dr. Glynn that the claimant fell one story when he was 16 years old, fracturing C5 and C6.  He told Dr. Glynn that he was unconscious for hours afterward and had a significant memory loss for at least one week afterward.  He also related that he has a chronic pain problem with memory and concentration problems.  He said that he has numbness in his hands.  He must recline and rest when he is on his feet a large part of the day.  His neck pain occurs throughout the day.  He has frequent headaches.  He frequently gets a tremor that last[s] for four hours if he lifts.  Dr. Glynn assessed cervical and thoracic degenerative joint disease and closed head injury, and prescribed Tolacin.

On that date, Dr. Glynn also sent a letter to the claimant's attorney, saying that the claimant could have had a serious concussion and anoxic brain injury during surgery.  The claimant had told him that he had had a pneumothorax and cardiac arrest during his surgery.  According to what the claimant told Dr. Glynn, his disability began at that time of injury and surgery.  The claimant denied having any problems with memory or organization prior to that.  Dr. Glynn said, "Indeed, he dropped out of school in the 10th grade, subsequent to the accident due to his inability to function at school."  The claimant also told Dr. Glynn that he had problems with anxiety.  On December 16, 2003, Dr. Glynn also completed Medical Source Statement - Mental and Medical Source Statement - Physical forms on behalf of the claimant and sent them to the claimant's attorney.  Thereafter, the treatment records of Dr. Glynn show that he was seen 1-2 times a month, and was prescribed various pain and psychotropic medications.  The claimant frequently requested different and stronger medications, which were provided.  In April 2004, Dr. Glynn met with the claimant's girlfriend who began dispensing the medications to the claimant, because the claimant had been switching back and forth on his various medications.  In September 2004, the treatment records show that the claimant had been beaten up by his stepson and removed from his home.  The claimant told Dr. Glynn and 1/2 of 2 weeks worth of his medicines had

40

been stolen. In October 2004, Dr. Glynn met with the
claimant and his girlfriend regarding their situation,
noting that he would continue to treat the claimant,
but with "zero tolerance." In November 2004, Dr. Glynn
completed a 2nd Medical Source Statement - Mental form
and Medical Source Statement - Physical form. This is
the sum total of medical treatment records submitted
into evidence. . . .

Thus, one sees that the claimant did not require any
medical care whatsoever when he allegedly became
disabled and for 1 1/2 years thereafter. He has based
his claim of disability upon a fall injury 18 years
earlier after which he was able to engage in
substantial gainful activity in various employments.
There is no evidence of worsening or deterioration of
his neck or back condition. There actually is no
evidence of treatment for the fall injury in evidence
at all. There is no evidence of actual physical or
mental examination of him from Dr. Glynn. He has
medical source statements from Dr. Glynn which have no
bases of medical signs, symptoms, laboratory findings,
or other acceptable clinical or diagnostic tests or
techniques, and are not consistent with the totality of
the evidence. He has essentially normal back
examination. He has not required physical therapy or
other pain relief modalities. He does not need any
type of assistive or supportive device. He has not
been referred for further pain intervention measures
such as a pain clinic or surgery or further evaluation
by a specialist. He has full grip strength and
functions in his hands. He has prescriptive pain
medications which relieve his subjective complaints
when taken as prescribed. The medical evidence does
not support the claimant's contention of severe
physical complaints, which are of a disabling or
debilitating degree of severity. Similarly, the
evidence does not support the claimant's contention of
a disabling degree of mental impairment. Based upon
psychological testing and evaluation, the claimant
retains the mental capacity to perform work related
mental activities on a sustained basis. The claimant
has never required psychiatric hospitalization or
outpatient treatment or evaluation. he has not had
psychological counseling. The claimant is able to lead

41

a normal lifestyle and engage in daily living
activities such as cleaning, washing dishes, vacuuming,
taking care of his 9 year old son, socializing,
shopping, reading and watching television.  Limitations
in his daily living activities would appear to [be]
more of a personal choice of lifestyle rather than
necessitated by physical or mental impairments.  The
claimant does not have a strong or consistent earnings
record, which injects an issue of secondary gain in his
claim for disability benefits herein.

. . .  [T]he undersigned finds that the evidence as a
whole does not fully support the claimant's contentions
as to disabling severity of his subjective complaints
and functional limitations.

(Tr. at 19-22).

### 1.   *PRIOR WORK RECORD*

As the ALJ pointed out, plaintiff has a very sparse

employment history, which indicates he may be unemployed due

to some reason other than his impairments.

### 2.   *DAILY ACTIVITIES*

Plaintiff reported that he is able to cook, shop,

clean, wash dishes, vacuum, perform household chores, drive

to take his son to and from school and to go to the doctor,

and help his son with his homework.  These activities are

inconsistent with plaintiff's allegations of disabling pain.

### 3.   *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

For more than a year and a half after plaintiff's

alleged onset date, he was taking no medications at all for

his symptoms, which clearly could not have been that bad.

Plaintiff reported in his administrative documents that he experiences his disabling symptoms all the time and had since his neck and spine injury when he was a teenager. Yet, he was able to engage in substantial gainful activity subsequent to that injury.

Plaintiff told Dr. Wadley that his back will lock up and he cannot move; however, he never complained of his back locking up to Dr. Glynn, his treating physician.

Plaintiff told Dr. Lutz that he is generally content and is usually happy. Dr. Lutz found plaintiff to have a GAF of 60, which is mild to moderate symptoms. This contradicts his allegation of disabling anxiety and depression.

Plaintiff told Dr. Lutz that his memory is about the same as it has always been. This of course includes the years when plaintiff was able to engage in substantial gainful activity despite those memory problems.

### 4.   *PRECIPITATING AND AGGRAVATING FACTORS*

Dr. Lutz suspected that plaintiff's generalized anxiety disorder may have been caused by alcohol and drug use. Plaintiff was arrested five months before his exam with Dr. Lutz for possession of paraphernalia. Dr. Lutz stated, "If he is using alcohol and/or marijuana more than he suggested,

43

it could certainly explain his behavior and appearance."

Plaintiff merely blames all of his symptoms on "stress".

## 5. *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

Plaintiff told Dr. Lutz that he does not take his medications as prescribed. He had gone two to four weeks without taking some of his medicine. Despite that, plaintiff admitted that his medication has been helpful in reducing his pain and controlling his aggression.

## 6. *FUNCTIONAL RESTRICTIONS*

No doctor has ever placed any functional restrictions on plaintiff. Indeed, the medical evidence in the record does not at all support the disabling symptoms plaintiff alleges.

Don May of Disability Determinations met face to face with plaintiff and observed that plaintiff had no difficulty with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using his hands, or writing. Dr. Wadley found that plaintiff's muscle strength was 5/5 in both upper and lower extremities. His gait was normal. His range of motion was normal except for a mild limitation in his neck consistent with cervical spinal fusion. Dr. Wadley found no

44

functional limitations on activities of daily living except for maybe limiting lifting to 25 pounds on a frequent basis.

When plaintiff saw Dr. Lutz, he did not report any hyperactivity, but said he was generally quiet, despite Dr. Glynn's diagnosis of Attention Deficit Disorder.

Dr. Lutz found that plaintiff had no mental limitations other than possible difficulty with complex tasks.

Plaintiff testified that he suffers from partial paralysis in his left leg; however, he never mentioned this to any doctor, including his treating physician.

## B.   CREDIBILITY CONCLUSION

I find that the above <u>Polaski</u> factors support the ALJ's credibility conclusion.  In addition, I note, as did the ALJ, that plaintiff had not been to see a doctor before his alleged onset date or for well over a year and a half after his alleged onset date.

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's decision to find plaintiff not credible.  Therefore, plaintiff's motion for summary judgment on this basis will be denied.

## VII. OPINION OF DR. GLYNN

Plaintiff argues that the ALJ erred in failing to give controlling weight to treating physician Dr. Glynn and

45

instead giving controlling weight to the opinion of
consultative examiners Dr. Wadley and Dr. Lutz.

The ALJ had this to say about Dr. Glynn:

Dr. Glynn completed medical source statement forms
which have no support or basis in the treatment
records. There is no record of any type of physical
examination actually performed by Dr. Glynn of the
claimant. It is clear that Dr. Glynn has never
actually seen any medical records concerning the
claimant's prior neck and back injury or the treatment
thereof. He has based his treatment of the claimant
totally on what the claimant has told him. There is no
independent or objective medical evidence in Dr.
Glynn's records -- merely a recitation of complaints
and limitations presented by the claimant, which the
undersigned notes are in conjunction with requests by
the claimant for increased and stronger medications and
completion of disability forms. Dr. Glynn has clearly
accepted everything related by the claimant even to the
point of conjecturing as to possible head injury
without any independent corroboration or even direct
examination by himself. Dr. Glynn has assessed the
claimant to have moderate to marked to extreme
limitations on his mental abilities to perform work
activities without any substantiation. Likewise, Dr.
Glynn has assessed the claimant to have the physical
residual functional capacity to perform not even as
much as sedentary work, including the inability to see,
speak, or hear. In correspondence to Dr. Glynn on
April 6, 2005, the undersigned provided the text of
various relevant Social Security Regulations, and
requested Dr. Glynn to provide the bases upon which he
relied in rendering the aforestated medical source
statement, both mental and physical, i.e., anatomical
or physiological abnormalities, psychological testing
or referral, etc. Dr. Glynn has not provided any bases
to support his conclusions contained in the medical
source statements.

(Tr. at 20).

46

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

In this case, the fourth and fifth factors listed above are really determinative. It is clear from the record that Dr. Glynn's opinion in his medical source statements (both mental and physical) are not supported by any medical signs or laboratory findings, and are not consistent with the record as a whole, including plaintiff's own allegations and activities.

47

Dr. Glynn found on the December 16, 2003, medical source statement physical that plaintiff could <u>never</u> see, hear, or speak. And lest we think that may have been a mistake, we look to the second medical source statement physical that Dr. Glynn completed almost a year later on November 24, 2004, and we see that Dr. Glynn still believed that plaintiff could <u>never</u> see, hear, or speak. Plaintiff has never complained of difficulty seeing, hearing, or speaking, not to Dr. Glynn, not to any other doctor, and not to anyone connected with his application for disability benefits.

On August 20, 2003, Don May met face to face with plaintiff and observed that plaintiff had no difficulty seeing, hearing, or answering. In his administrative questionnaires, plaintiff reported that he could cook a meal, shop, do household chores, help his son with his homework, and drive his son to and from school. Clearly these activities contradict Dr. Glynn's finding that plaintiff can <u>never</u> see, hear, or speak.

Dr. Glynn also found in December 2003 that plaintiff must lie down or recline for a half an hour twice per day. Eleven months later he found that plaintiff must lie down or recline for an hour twice a day. On December 16, 2003 (the

48

day the first MSS-Physical was completed by Dr. Glynn),
plaintiff stated that when he is on his feet a large part of
the day he must recline and rest.  There is no other
allegation by plaintiff that he needs to lie down or recline
during the day, not to Dr. Glynn, nor to anyone else.  There
is no recommendation by any doctor, including Dr. Glynn,
that plaintiff lie down or recline during the day, or that
he limit his standing or walking in any way.

Dr. Glynn found that plaintiff could sit continuously
for 15 minutes and for a total of two hours per day in
December 2003, and then in November 2004 he found that
plaintiff could sit continuously for 30 minutes and for
three hours per day.  Plaintiff testified that he was able
to sit in the car for the 30 to 40 minutes it took to get to
the administrative hearing, and he was able to sit through
the entire hearing without difficulty.  On August 20, 2003,
Don May met face to face with plaintiff and observed that
plaintiff had no difficulty sitting, standing, or walking.

Plaintiff testified at the administrative hearing that
when his back locks up, he must elevate his legs and sit
upright until his back unlocks, which normally takes a week.
Clearly this testimony contradicts Dr. Glynn's finding that
plaintiff can only sit for less than an hour at a time and

49

for only two to three hours per day.

There is no indication in Dr. Glynn's medical records that plaintiff ever complained of difficulty in sitting for any length of time. Dr. Glynn never recommended that plaintiff limit his sitting in any way.

As the ALJ pointed out, Dr. Glynn's medical records do not include any tests whatsoever, no mental tests, no physical exams, no range of motion measurements. There is no indication that he ever reviewed any of plaintiff's medical records from his fall which allegedly caused his neck and back injury. Dr. Glynn simply listened to plaintiff's complaints, including demands for more or different medication, and wrote prescriptions. When the ALJ requested explanations from Dr. Glynn as to how he arrived at his conclusions, Dr. Glynn chose not to respond. An ALJ is justified in discrediting the opinion of a physician when that opinion is based solely on the claimant's subjective complaints and is not supported by other findings. Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993).

Dr. Glynn never sent plaintiff to physical therapy, never referred him to any kind of specialist, never gave him exercises to perform, never arranged for him to have counseling. This is despite repeated diagnoses of cervical

Case 6:05-cv-03364-REL   Document 11   Filed 01/10/07   Page 50 of 58

degenerative joint disease, thoracic degenerative joint disease, closed head injury, anxiety, attention deficit disorder, bipolar disorder, depression, and post traumatic stress disorder. In one record plaintiff told Dr. Glynn he was on the verge of a nervous breakdown, and still Dr. Glynn did nothing but write another prescription.

Dr. Glynn found plaintiff's impairments disabling on December 16, 2003, when he completed the first medical source statement physical and medical source statement mental. Yet, every appointment plaintiff had had with Dr. Glynn prior to that day (there were three of them) dealt only with his having teeth knocked out when he was punched in the face. The first diagnosis made by Dr. Glynn was dental abscess. The second visit was for a recheck on the teeth. The third visit was to complain of teeth fragments coming through the gums and his antibiotic upsetting his stomach. There were no complaints of depression, anxiety, neck pain, back pain, numbness, problems with standing, problems with sitting, problems with walking, needing to lie down or recline, etc. Those allegations came for the first time on December 16, 2003 -- the day Dr. Glynn was presented with medical source statements to complete for plaintiff's application for disability benefits.

51

Dr. Glynn's medical source statements mental are likewise not supported by any evidence at all. Dr. Glynn found that plaintiff was "extremely limited" in his ability to be punctual, yet there is not one indication in his medical records that plaintiff ever missed an appointment or was late for an appointment. Dr. Glynn found that plaintiff was "markedly limited" in the ability to ask simple questions or request assistance. Yet Dr. Glynn's records are full of examples of plaintiff telling Dr. Glynn what medication plaintiff wanted to try, or what dosages he thought he should be taking. There is no evidence that plaintiff has any problems with requesting assistance or asking questions.

Because Dr. Glynn's opinions are based on absolutely no medical evidence whatsoever, and because they completely contradict all of the other evidence in the record, including plaintiff's allegations, his daily activities, his testimony during the administrative hearing, and his statements to other doctors, the ALJ did not err in failing to give controlling weight to Dr. Glynn's opinion.

The ALJ did give controlling weight to the opinions of Dr. Wadley and Dr. Lutz, both of whom were asked by Disability Determinations to examine plaintiff. An ALJ may

properly give more weight to one-time examining/consulting physicians when they prepared more thorough reports than the treating physician.  <u>Cantrell v. Apfel</u>, 231 F.3d 1104, 1107 (8th Cir. 2000).

At the time Dr. Wadley examined plaintiff, there was not one medical record in existence, although his alleged onset of disability was more than one year and seven months before he was seen by Dr. Wadley.  Therefore, it is apparent that plaintiff's condition was not as bad as he alleges, as he had been seeking no medical attention and was on no medication for his impairments.

Dr. Wadley performed a complete physical exam which included range of motion measurements.  She found that plaintiff had normal range of motion everywhere except for slightly decreased range of motion in his neck.  Based on plaintiff's statements to her, her physical exam of him, and his range of motion, Dr. Wadley found that plaintiff had no functional limitations in activities of daily living, except for maybe lifting greater than 25 pounds.

Dr. Lutz examined plaintiff, reviewed all of Dr. Glynn's records, and conducted the Wechsler Adult Intelligence Scale-III, the Wechsler Memory Scale-III, the Trail Making Test Part A and the Trail Making Test Part B.

It is noteworthy that Dr. Lutz uncovered multiple
inconsistencies in plaintiff's allegations:  Plaintiff told
Dr. Lutz that he had experienced a breakdown during the
previous year; however, there are not only no medical
records to substantiate a breakdown, plaintiff never
mentioned it to the ALJ during the hearing.

Plaintiff told Dr. Lutz that he is generally happy and
content.  This of course contradicts Dr. Glynn's repeated
diagnoses of depression.

Plaintiff told Dr. Lutz that during the altercation
with his step son, he hit his girlfriend and was jailed for
assault.  When questioned at the hearing about this
incident, plaintiff left out the part about hitting his
girlfriend.  Instead, he testified that he was hit by his
stepson and he was jailed although he never hit back.

Although plaintiff told Dr. Glynn that he had a violent
childhood (and from that allegation came Dr. Glynn's
repeated assessment of post traumatic stress disorder),
plaintiff told Dr. Lutz that was not the case.

When asked by Dr. Lutz about the diagnoses by Dr. Glynn
of closed head injury, plaintiff said he had various
childhood injuries which may have required stitches, but
that was it.  He failed to relay the story about having

54

surgery and dying on the operating table.

All of these inconsistencies in plaintiff's allegations to Dr. Lutz and to Dr. Glynn provide even more support for the ALJ's decision to discredit Dr. Glynn.  Dr. Glynn's opinions are based solely on plaintiff's allegations, and it is clear from all of these inconsistencies that plaintiff's allegations were not always truthful.

Plaintiff told Dr. Lutz that his memory is about the same as it has always been, and plaintiff of course has been able to engage in substantial gainful activity despite whatever memory problems he has "always had".

After considering all of plaintiff's test results, Dr. Lutz found that plaintiff may have some difficulty with complex instructions, but had no other mental limitations. He also suspected that plaintiff's impairment (slight though it was) may have been due to alcohol and/or drug use.

Because Dr. Wadley and Dr. Lutz both performed medical tests prior to arriving at the conclusions regarding plaintiff's limitations, the ALJ properly relied on their opinions.

Based on the above, I find that the ALJ properly discredited the opinion of treating physician Dr. Glynn and properly relied on the opinions of consulting physicians Dr.

55

Wadley and Dr. Lutz.  Therefore, plaintiff's motion for summary judgment on this basis will be denied.

## VIII. PLAINTIFF'S RFC

Plaintiff argues that the ALJ failed to properly derive a residual functional capacity as the RFC is vague and unrelated to any specific medical evidence or testimony. This argument is without merit.  As discussed at length above, the ALJ properly discredited the opinions of Dr. Glynn -- after giving Dr. Glynn an opportunity to explain the bases for those opinions -- and properly relied on the opinions of Dr. Wadley and Dr. Lutz.  The opinions of those doctors, along with plaintiff's daily activities and his lack of medical history, support the ALJ's determined residual functional capacity.

## IX. COMPARISON OF RFC TO PAST RELEVANT WORK

Finally, defendant argues that the ALJ failed to compare plaintiff's residual functional capacity to his past relevant work and how plaintiff performed it.

The vocational expert testified that plaintiff's past relevant work as a product assembler was performed at the light exertional level.  The vocational expert is a specialist in employment and vocational factors which influence employment.  The ALJ properly relied on the

56

vocational expert's testimony in ascertaining the demands of plaintiff's past relevant work. Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991); Trenary v. Bowen, 898 F.2d 1361, 1365 (8th Cir. 1990).

The ALJ's responses to the three hypotheticals do not support plaintiff's argument. The ALJ did not find plaintiff's RFC to match any of the RFCs described in the hypotheticals. The first two hypotheticals incorporated the medical source statement physical and medical source statement mental completed by Dr. Glynn. The ALJ properly discredited those opinions and did not find that either matched the RFC of plaintiff. The third hypothetical incorporated all of plaintiff's subjective allegations. Plaintiff was properly found not credible by the ALJ. Therefore, it is clear that none of the testimony by the vocational expert with regard to the hypotheticals was relied upon by the ALJ.

## X. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff can return to his past relevant work as product assembler and is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_____
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 9, 2007